**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

<table>
<tr><td>

SUMMIT TRANSPORT CORP,

*Plaintiff*,

v.

HESS ENERGY MARKETING, *et al.*,

*Defendants*.

</td><td>

Civil Action No. 14-5119
(JMV) (MF)

**OPINION**

</td></tr>
</table>

**John Michael Vazquez, U.S.D.J.**

    This case concerns a business relationship, and whether it was a joint venture, between Plaintiff Summit Transport Corp. ("Summit") and Defendant Hess Corporation ("Hess"). Currently pending before the Court is Defendants Hess and Hess Energy Marketing, LLC's ("HEM") (collectively, "Defendants") motion for summary judgment, and Hess' motion for summary judgment as to its counterclaims[1] against Summit, Horizon Oil Corp. ("Horizon"), Marc Rosen, Kenneth Rosen, and Laura Rosen (collectively, "Counterclaim-Defendants"). D.E. 96. The Court reviewed the parties' submissions[2] and decided the motion without oral argument

---

[1] Hess' counterclaims are, in part, incorrectly named. As a result, the case caption is also incorrect. Pursuant to Federal Rule of Civil Procedure 13, Hess should have filed counterclaims as to the Plaintiff Summit. Pursuant to Federal Rule of Civil Procedure 14, Hess should have filed a third-party action against the non-parties, Horizon and the Rosens. Hess would have then been a third-party plaintiff, while Horizon and the Rosens would proceed as third-party defendants. Also, the nomenclature of counterclaim-plaintiff is unnecessary. Instead, Hess is a defendant who filed counterclaims as to Plaintiff Summit. Because these issues were not raised by the parties, and because they do not affect the Court's analysis, the Court proceeds with the terminology used by the parties.

[2] The following briefs were submitted in connection with this motion: Defendants' memorandum

pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons set forth below, Defendants' motion for summary judgment as to Plaintiff's claims is **GRANTED**, and Hess' motion for summary judgment as to its counterclaims is **DENIED**.

## I. Procedural History & Factual Background[3]

### A. Procedural History

On July 3, 2014, Plaintiff filed a Complaint in the Superior Court of New Jersey, listing five counts: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of duty to co-venturer; (4) estoppel; and (5) unjust enrichment. D.E. 1-1. On August 14, 2014, Defendants removed the matter to this Court. D.E. 1. On September 12, 2014, Defendants filed a joint motion to dismiss. D.E. 15. Judge Arleo denied the motion on February 27, 2015. D.E. 28. On March 13, 2015, Defendants filed an Answer and Hess also asserted the following counterclaims: (1) breach of contract against Summit; (2) quantum meruit against Summit; (3) breach of contract against Horizon; (4) account stated against Horizon; (5) quantum meruit against Horizon; (6)-(7) Summit Guaranty against Marc Rosen; and (8)-(9) Horizon Guaranty against Kenneth Rosen and Laura Rosen. D.E. 30. On April 17, 2015, Counterclaim-Defendants filed an answer to the counterclaims.[4] D.E. 39.

---

in support of its motion, D.E. 97, hereinafter "Defendants' Brief" or "Def. Br."; Plaintiff's Brief in Opposition, D.E. 105, hereinafter "Opposition" or "Opp."; Defendants' reply memorandum, D.E. 110, hereinafter "Reply Brief" or "Reply."

[3] The facts are taken from the parties' respective statements of material fact as well as the documents attached: Defendants' Rule 56.1 Statement of Material Facts not in Dispute, D.E. 98, hereinafter "Def. SOMF"; Plaintiff's and Counterclaim Defendants' Responsive and Supplemental Statement of Material Facts not in Dispute, D.E. 104, hereinafter "Pl. SOMF"; Defendants' Response to Plaintiff's and Counterclaim-Defendants' Supplemental Statement of Material Facts not in Dispute, D.E 111, hereinafter "Def. Resp. SOMF."

[4] Again, as set forth in note 1, Summit should have filed an answer to the counterclaims, and Horizon and the Rosens should have filed an answer as third-party defendants.

On November 3, 2017, Defendants filed a motion for summary judgment, D.E. 96, 97, 98. Plaintiff and Counterclaim-Defendants filed opposition, D.E. 104, 105; to which Defendants replied, D.E. 110, 111.

### B. Factual Background

**The Parties and Their Business Relationships**

The genesis of this case is based on a prior relationship between Forest Transport Corp. ("Forest") and Hess. Marvin Rosen founded Forest in the early 1980s. Def. SOMF at ¶ 1. Forest entered into an agreement with Hess in 1985. Purportedly present during the meetings which led to the agreement were Marvin and Kenneth Rosen, Marvin's son, along with Hess officials Felix Palumbo, Stuart Hankin, and Louis Romano. Def. SOMF at ¶ 5; Pl. SOMF at ¶ 5. The agreement was never reduced to writing. Def. SOMF at ¶ 14; Pl. SOMF at ¶ 14. The parties disagree as to the scope of the agreement but appear to agree that the business relationship worked along the following lines: Forest agreed to seek potential customers for Hess, Forest would deliver fuel oil from Hess to the customers, and Hess would pay Forest for its deliveries. Def. SOMF at ¶ 4; Pl. SOMF at ¶ 4. Hess's credit department's approval was required before Hess accepted a new customer through Forest. Def. SOMF at ¶ 16. Pursuant to the agreement, Forest made its first delivery around August or September 1985. *Id.* at ¶ 17.

Horizon was founded by Kenneth Rosen in 1987. *Id.* at ¶ 18. Horizon sold fuel oil in New York. *Id.* at ¶ 20. In 1989, Horizon bought oil from Hess, which Horizon then sold to its own customers using Forest for transportation. *Id.* at ¶¶ 21-22. Kenneth and Laura Rosen, his spouse, executed an unconditional guaranty of Horizon's obligations to Hess in 1989. *Id.* at ¶ 23.

Forest ceased operations in 1989. *Id.* at ¶ 34. Plaintiff Summit was founded by Marc Rosen, also Marvin's son, the same year. *Id.* at ¶ 7. Forest sold its assets to Summit for $100,000,

3

but again there was no written contract. *Id.* at ¶¶ 36, 38. After Forest stopped operating, Horizon started using Summit to transport oil. *Id.* at ¶ 35. Marc Rosen executed an unconditional guaranty of Summit's obligations to Hess, which Hess acknowledged by receipt on July 21, 1994. Def. SOMF at ¶¶ 48, 50.

According to Defendants, Forest did not formally assign any of its Hess accounts to Summit. *Id.* at ¶¶ 39, 40. Plaintiff responds that "[t]he accounts procured by Forest were part of Summit's purchase of Forest and were seamlessly serviced by Summit following the change of ownership." Pl. SOMF at ¶¶ 39, 40. The parties also disagree on whether Hess was made aware of the alleged assignment, including the right to be the primary carrier on any Hess account. Def. SOMF at ¶ 42; Pl. SOMF at ¶¶ 42. Plaintiffs further assert, although Defendants disagree, that Forest (and then later Summit) developed HEM's[5] customer base pursuant to a joint venture arrangement with Hess that began in 1985. Pl. SOMF at ¶¶ 44; Def. SOMF at ¶ 44. The parties agree that if Summit brought in a new customer and the customer consented, Hess would assign Summit to be the carrier for that customer. Def. SOMF at ¶ 70.

As to the Summit-Hess relationship, Hess was the sole owner of the fuel oil Summit transported; Summit had no property interest in the oil. *Id.* at ¶¶ 58, 59. The parties agree that there is no written agreement between Hess and Summit to share profits and losses, but they disagree as to whether they entered into joint venture. Def. SOMF at ¶¶ 61, 65; Pl. SOMF at ¶¶ 61, 65. Summit claims that they did enter into a joint venture; Hess says that they did not. The parties also disagree over whether Summit would be compensated if Hess ever sold its business or if the parties decided to end the arrangement between them. Def. SOMF at ¶¶ 75, 76; Pl. SOMF

---

[5] HEM's provenance is unclear to the Court. The parties did not clearly delineate HEM's origins or the role that it played prior to its sale by HESS in 2013. The parties also do not clearly indicate HEM's role vis-à-vis Forest, Summit, and/or Horizon before it was sold by Hess.

at ¶¶ 75, 76. Again, Summit says that it would be compensated; Hess says that Summit would not.

A business relationship between Horizon and Hess also existed, although the parties disagree as to its nature. Horizon submitted tax forms to Hess to purchase oil on a wholesale basis without paying sales tax, and Horizon paid many of Hess' invoices to Summit, including some processed within the last year of the Summit and Hess' relationship. Def. SOMF at ¶¶ 101, 102; Pl. SOMF at ¶¶ 101, 102. Kenneth Rosen never directed Hess to not bill Horizon or to bill Summit instead of Horizon. Def. SOMF at ¶ 103.

**The Transportation Agreement**

Although there is disagreement over the context of the contract, Hess and Summit did execute a Transportation Agreement (the "Agreement") dated August 1, 2006. Def. SOMF at ¶ 77; Pl. SOMF at ¶ 77. Marc Rosen and Felix Palumbo, Hess' Traffic Department Manager, signed the contract. Def. SOMF at ¶ 78. The Agreement addressed the parties' rights and obligations as to Summit transporting fuel oil for Hess. *Id.* at ¶ 79.

The Agreement identified Summit as a "[c]arrier." D.E. 98-4 at 2. Summit was not permitted to assign or transfer its interest under the Agreement without written consent from Hess. *Id.* ¶ 12. The Agreement's effective dates were August 1, 2006 to July 31, 2007, with automatic renewals for successive one-year periods unless Hess terminated the Agreement with at least 30-days written notice. *Id.* ¶ 19. In fact, during any renewal period, Hess had the option of ending the Agreement on 30-days written notice. *Id.* ¶ 20.

The Agreement stated that Hess was in the business of selling "Petroleum Products," which included gas, diesel fuel, kerosene, and fuel oil in New Jersey, New York, and "elsewhere"; Hess wished to establish a delivery service of these products to its customers; and Summit wanted to deliver these products for Hess. *Id.* The "Terminals and Customers" section indicated that Hess

owned and operated various petroleum terminals in New Jersey and New York, known as "Hess Terminals," and that Hess delivers to its New Jersey and New York customers, or "Hess Customers." *Id.* ¶ 1. There was no mention of "joint customers" between Hess and Summit.

Summit further agreed to provide "Services," which were defined as Summit picking up, transporting, and delivering all Petroleum Products from Hess. *Id.* ¶ 2. The same section also mentioned that Summit would conduct these Services in accordance with Hess' "General Instructions,"[6] which were attached as an exhibit to the Agreement. *Id.* Under the "Payment" section of the Agreement, Hess agreed to pay Summit for the Services at specified rates. *Id.* ¶ 7.

Under the "Delivery Service" section, Summit agreed to deliver product to Hess customers. *Id.* at ¶ 3. This section also provided for a monthly reconciliation of the difference between loaded and delivered quantities. *Id.* For the reconciliation, Summit indicated that it would provide information of the prior month's business to Hess early the following month, while Hess agreed to compile a reconciliation of the difference between loaded and delivered quantities within a week thereafter. *Id.* If there were any discrepancies, Summit was to supply supporting documentation. *Id.* The Agreement continued that "[a]ll balances will be agreed upon within 10 days following [Summit's] receipt of the reconciliation. [Summit] will have the option to return product volumes meeting Hess product specifications for balances due Hess, or to be charged for the product[.]" *Id.*

Also, under the "Delivery Service" section, Summit was responsible for all expenses or damages, including deliveries made to an incorrect location, resulting from any act or omission of Summit in performing its obligations under the Agreement. *Id.* Similarly, in the "Indemnity"

---

[6] Hess General Instructions, attached to the Agreement as Exhibit A, included sections entitled "Operating Instructions – Safety Precautions"; "Personal Conduct of Drivers"; "Pre-loading Action"; "Loading Procedures"; and "Unloading Procedure: Driver Responsibilities." *Id.* at Ex. A.

section, Summit agreed to defend and indemnify (including counsel fees) Hess against any claim

or loss incurred by Hess for death or injury to any person, property damage, violation of any laws

or breach of the Agreement, which resulted from any act or omission of Summit. *Id.* ¶ 8.

The "Relationship of Parties" section provided as follows:

> [Summit] is an *independent contractor of Hess* and neither
> [Summit] nor anyone used or employed by [Summit] will be deemed
> to be an employee, agent or representative of Hess. Hess will have
> no control or supervision of [Summit] or its employees,
> representatives or agents. [Summit] will have no authority to act for
> or bind Hess, except as specifically agreed to in writing signed by
> Hess.

*Id.* ¶ 5 (emphasis added).

Importantly, the "Entire Agreement" section stated the following:

> This Agreement comprises the entire Agreement between Hess and
> [Summit], and there are no agreements, understandings, warranties
> or representations, oral or written, expressed or implied, *that are not
> merged in or superseded by this Agreement.* Any change in or
> modification of this Agreement will be binding only if the change
> or modification is in writing and signed by both parties.

*Id.* ¶ 15 (emphasis added). The "Governing Law" section indicated that New Jersey law applied

to the Agreement and also provided that the prevailing party would be entitled to reasonable

counsel fees and costs in litigation that arose "in connection with this Agreement[.]" *Id.* ¶ 16.

Under the Agreement's Termination section, Summit and Hess agreed that a breach of the

Agreement included, among other things, Summit's failure to complete its Services in accordance

with dates or times set by Hess; Summit's failure to maintain motor vehicles, equipment, supplies

or personnel necessary for performance; and failure to comply with any term of the Agreement.

*Id.* ¶ 20. The section continued that if any breach occurred, Hess was allowed to terminate the

Agreement by giving written notice and that Hess could take any action it believed is necessary to

remedy the breach, such as hiring a subcontractor. *Id.* Furthermore, Summit agreed to be

responsible for any such action taken to remedy a breach. *Id.*

As noted, the Agreement nowhere mentioned joint customers between Summit and Hess. Moreover, the Agreement made no reference to any joint venture between the two entities.

**End of the Summit-Hess Relationship**

Pursuant to the Agreement, Hess prepared a reconciliation for the month ending April 30, 2014, showing that Summit owed Hess $980,233.96. Hess billed Summit for that amount in a June 3, 2014 invoice, which both Horizon and Summit received but did not pay. Def. SOMF at ¶¶ 104, 105, 106, 110.

Around November 1, 2013, Hess sold HEM, part of their fuel oil business, to Direct Energy Business, LLC ("Direct Energy"). *Id.* at ¶¶ 111. Pursuant to their Asset Purchase Agreement, Direct Energy did not assume any "liabilities, commitments or obligations that arise from, are a result of or attributable to any failure to perform, improper performance, or other breach, default or violation by [Hess]." *Id.* at ¶ 112. Then in 2014, Direct Energy sold HEM to United Metro Energy Corp. ("United Metro"). *Id.* at ¶ 113. Although Defendants disagree, Plaintiff asserts that it brought in new customers to HEM after it was sold to Direct Energy. Plaintiff further asserts that it was discharged when HEM was sold to United Metro. Pl. SOMF ¶¶ 121, 124; Def. Resp. SOMF at ¶ 121, 124.

**Evidence Adduced During Discovery**

Much of the discovery undercuts critical allegations in the Complaint. Summit's Complaint states that by the time that Summit and Hess entered into a joint venture in 1985, "Summit had established itself as a leading retail supplier of fuel oil and related transport and other services to institutional and residential customers, including multiple-apartment dwellings, within New York City." Compl. ¶¶ 14, 15. As noted, Summit was not formed until 1989. Def. SOMF

at ¶ 7. Marc Rosen also admitted that after Summit was formed in 1989, Summit's business involved transporting fuel oil for Hess and Horizon but not selling fuel oil in New York as it was not licensed to do so. *Id.* at ¶ 45. Additionally, the Complaint claims that "[e]ventually, Hess and Summit worked out a joint venture arrangement pursuant [sic] Summit turned over its valuable long-time retail accounts to Hess which serviced the former Summit accounts in its own distinctively Hess-branded fuel trucks, in which venture the two parties would share in the profits and losses." Compl. ¶ 19. In his testimony, Marc Rosen admitted that there was a mistake in paragraph 19 of the Complaint; however, he does not clarify the nature of the mistake. D.E. 98-5 at 52-54. Marc also does he know when the alleged joint venture arrangement was "worked out." *Id.* Subsequently, Summit's counsel stated on the record: "I'm making that judicial waiver right now that paragraph 19 contains serious errors. So we will, and again, in the very near future, submit for your consideration an amended – with no meaningful substantive changes. I will amend it." *Id.* at 54-55. Similarly, on November 19, 2015, at a conference before Magistrate Judge Wettre, Summit's counsel again stated that he would seek to file an Amended Complaint. *Id.* at 5. The Complaint was never amended.

Similarly, the Complaint alleges in paragraphs 19-22 that Summit shared profits with Hess. Yet, when asked about compensation during the depositions, Marc Rosen's responses did not support any alleged sharing of profits. Instead, Marc Rosen's responses made clear that Summit was paid an agreed upon amount: "I was paid freight money, that's right. But we did bring in the account to Hess. Without us bringing the accounts in, Hess would not have had the joint venture account with us… We negotiated a rate with Hess, and got paid from Hess for delivering the freight." D.E. 98-5 at 237. Furthermore, Marc Rosen was asked multiple times in his deposition questions about compensation, and he responded in the affirmative to the following list of

questions: "And Summit's compensation would be the freight it earns on transporting that fuel oil?" *Id.* at 72; "Is it fair to say, based on your prior testimony, that to the extent that new accounts were brought to Hess by Summit, the compensation to Summit would be the freight money that was earned by Summit transporting oil for those accounts?" *Id.* at 116; "My understanding of that is that the compensation to Summit was the amounts that it invoiced Hess for oil that was transported for Hess; is that correct?" *Id.* at 140-41; and "But Summit was only going to be paid to the extent that it transported fuel oil for that account; correct?" *Id.* at 143. Similarly, Kenneth Rosen acknowledged in his testimony that "[their] money was being made through [their] transport rates." D.E. 98-7 at 31.

Paragraph 30 of the Complaint provides that "Summit came to learn, albeit not from Hess, that Hess was neither reporting such additional revenue to Summit nor sharing it with Summit." Compl. ¶ 30. Marc Rosen, however, admitted in his testimony that if Summit was not assigned as the carrier of a new account it brought in, he would confer with Hess about the issue verbally, and the records would be corrected to make Summit the carrier of that account. D.E. 98-5 at 132-33.

As to Summit's obligation to share in profits and losses with Hess, the Complaint asserts:

> [I]f an account or lead supplied by Summit to Hess resulted, through no fault of Summit's, in a loss to Hess – i.e., because of Hess's inability to collect accounts receivable or incurring other unrecoverable costs – Hess would insist that Summit 'share the pain' and provide a credit to Hess or a reduction in amounts due to Summit on unrelated business.
>
> On the other hand, though Summit knew of circumstances where Hess realized unforeseen or additional profit from a Summit referral or account…Hess never shared the windfall with Summit, even if Summit demanded, pursuant to their joint venture relationship, that Hess do so.

Compl. ¶¶ 25, 26. When questioned about the foregoing language, Marc Rosen referred to two occurrences: the first involved a customer discount based on Summit's failure to obtain signed

delivery receipts, D.E. 98-5 at 119-24, and the second concerned Summit pumping the wrong type of fuel oil into the customer's boiler, which caused a fire, *id.* at 124-29.

As to Summit and Hess ending their relationship, Marc Rosen admitted that there was nothing in writing concerning Summit's allegation that the parties would negotiate compensation if either party ended the alleged joint venture. Def. SOMF ¶ 76. Marc Rosen further acknowledged that it was "not 100 percent accurate" that "'Hess would fully compensate Summit for its share in their joint venture in the event of a sale.'" D.E. 104-7 at 292.

Plaintiff asserts that deposition testimony given by Hess' representatives confirmed a joint venture arrangement between Hess and Forest. Opp. at 5-6. This assertion is belied by the record. Instead, it appears that Hess' representatives merely admitted that there was a business relationship between Hess and Summit. Felix Palumbo, Hess' traffic manager for 30 years, stated that he was not aware of a joint venture agreement, any profit sharing, any agreement to pay additional compensation to Summit if Hess earned additional revenue, or any special arrangement between Hess and Summit that differed from that of the other carriers. D.E. 104-3 at 66-69. Kevin Peter, a Hess manager, indicated that if Summit brought in a new customer to Hess, it would be the authorized carrier to that location. D.E. 104-8 at 30-31. Louis Romano, Hess' New York City sales manager in 1985, said that if the Rosens brought in a new customer who passed Hess' credit check, Summit would be the assigned carrier for that account, D.E. 104-4 at 14-15; and he affirmed that Summit's compensation was its transportation fee, *id. at* 36. Thomas Gowers, a Hess fuel oil salesman, testified that Summit's relationship with Hess was not different from Hess' relationship with other carriers. D.E. 104-5 at 13-14. Stephen King, Hess' customer services manager, acknowledged that Summit would usually be assigned as the carrier for any new customer it brought in but that sometimes an account would be taken away from Summit for certain reasons.

D.E. 104-6 at 29-31. Lenore Richardson, Hess' ordering department manager, said the same. D.E. 104-10 at 22-24.

In his deposition, Marvin Rosen testified that although there was no formal assignment of Hess' delivery accounts, it was "understood" that they were assigned from Forest to Summit. D.E. 98-6 at 53. Marvin Rosen also admitted that Forest never sought Hess' consent to transfer any delivery accounts. *Id.* He further testified his company was paid freight money that "would be on a much higher level to compensate for this whole partnership relationship that [they] had," but that there was no written agreement memorializing this arrangement. *Id.* at 21-22. Marvin, however, provided no basis or evidence to support his belief that Forest was paid at a higher rate than other Hess carriers. Marvin Rosen also stated that Kenneth Rosen formed Horizon to sell fuel oil to New York customers, *id.* at 48-49, and that the only asset Forest sold to Summit was trucks, *id.* at 52. Marc Rosen indicated that when he founded Summit in 1989, he purchased Forest's equipment and the Hess accounts for $100,000, but that neither a written assignment nor written consent was ever executed. D.E. 98-5 at 16, 218-221. Marc Rosen asserted that Summit is a "completely separate corporation" from Forest. *Id.* at 114.

Kenneth Rosen testified that when he was still a Forest employee (and before the formation of Horizon), he met with Felix Palumbo to propose bringing new accounts to Hess and doing a joint partnership. D.E. 98-7 at 23-25. Kenneth Rosen also testified that during this meeting, "there was [sic] no promises made, no commitment. This was Hess. Nobody put their neck on the line. Nobody promised anything. It was like try and see and then we'll go from there." *Id.* at 25. After his meeting with Palumbo, Kenneth and Marvin Rosen presented this same proposal to Stuart Hankin and another man at Hess and then again to Louis Romano. *Id.* at 26-29. When asked about what was discussed with Romano at their meeting, Kenneth Rosen stated, "Basically let's bring in

accounts, I'll go with you, we'll sell Hess, we'll do business," but none of this was memorialized in writing. *Id.* at 30-31. He also confirmed that Summit did not exist in 1985. *Id.* at 46. Additionally, Kenneth Rosen testified that from when he founded Horizon in 1987 until 1989, he used Forest as Horizon's carrier and then switched to Summit. *Id.* at 41. In 1989, Horizon also developed its own relationship with Hess by purchasing its fuel oil to sell to Horizon customers. *Id.* at 50-51.

### Hess' Counterclaims

Hess filed counterclaims against Summit, Horizon, Marc Rosen, Kenneth Rosen, and Laura Rosen for $980,233.96, the cost of the fuel oil that Summit allegedly acquired from Hess but did not pay for. Def. SOMF at ¶ 110. Pursuant to the Agreement, as discussed above, Hess followed a reconciliation process each month that calculated the difference between the amount of fuel oil that Summit loaded and the amounts that were accounted for by signed delivery tickets returned to Hess. Def. SOMF at ¶¶ 81-82. If Summit disagreed with Hess' calculations, it had ten days to resolve any discrepancies; if not, the reconciliation was deemed as having been accepted. *Id.* at ¶ 82. If Summit delivered less fuel oil than it loaded, it was required to make up for that loss. *Id.* Around April 30, 2014, Hess sent Summit the reconciliation, which showed that Summit had loaded 330,574 gallons of fuel oil that it did not deliver to Hess' customers. *Id.* at ¶ 104. Hess did not receive any objection from Summit within the ten-day period, so it billed Horizon an invoice for $980,233.96. *Id.* at ¶¶ 105, 107. Horizon did not pay and neither did Summit, but Summit claims to have never been invoiced for the amount. *Id.* at ¶ 110; Opp. at 41.

Hess claims that based on an allegedly agreed upon practice, it issued the invoice to Horizon and not Summit. Hess points to various evidence to support this contention. Horizon was a Hess customer that used Summit as its carrier. D.E. 98-7 at 50-51. Thus, some of the fuel oil

billed on each invoice was allegedly the responsibility of Horizon. Def. Br. at 34. Hess adds that Kenneth Rosen wrote a letter dated March 14, 2007 to Hess' Director David Cerulo, stating that Horizon was taking on the responsibility of paying all costs of "the variations"[7] due to a Hess customer being unable to accept the entire product as ordered. D.E. 98-30; Def. SOMF at ¶ 99; Pl. SOMF at ¶ 99. Plaintiff disputes the validity of the letter. Kenneth Rosen testified that Marc Rosen sent the letter, and that Horizon sometimes paid Summit's invoice until Summit could pay Horizon back. D.E. 98-7 at 74-75. Kenneth Rosen testified that on occasion, Horizon would take extra fuel from Summit when Summit could not complete a delivery. *Id.* at 70-71, 75-77. Horizon was licensed to sell fuel oil in New York and had tax exemption certificates. Def. SOMF at ¶ 101. Hess claims that it was doing Summit a favor by invoicing Horizon because Summit would have had an additional line item for taxes if invoiced. Def. Br. at 41. In addition, allegedly Summit could not pay the invoices and would look to Horizon to pay for them. *Id.*; D.E. 98-7 at 77-78.

In September 1989, Kenneth and Laura Rosen executed an unconditional guaranty, jointly and severally, guarantying the prompt payment of all of Horizon's indebtedness to Hess. They agreed to be liable for the costs of collection, including Hess' reasonable attorney fees, and also agreed to accept Hess' book entries as proof of sale and delivery to Horizon. D.E. 98-11. Moreover, the guaranty required a written notice in order to revoke any liability. *Id.* Hess acknowledged receipt of the guaranty by two identical letters dated September 27, 1989, which read, "We rely on this guaranty as an inducement to extend credit terms[.]" D.E. 98-27. In July 1994, Marc Rosen executed an identical unconditional guaranty for Summit's indebtedness to Hess, D.E. 98-11, and also received the same receipt of guaranty by letter, D.E. 98-28. In their

---

[7] The parties fail to indicate what is meant by "variations."

testimonies, Kenneth, Laura, and Marc Rosen admitted to signing and never revoking their respective guaranties. Def. SOMF ¶¶ 23, 27, 48, 52.

## II.    Standard of Review

### A. Summary Judgment Standard

Summary Judgment is proper where the moving party "shows that there is no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To

withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

### B. Choice-of-Law

"A federal court sitting in diversity applies the choice-of-law rules of the forum state ... to determine the controlling law." *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013). In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits. *Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). New Jersey applies the "most significant relationship" test to determine the choice of law. *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 171-72 (3d Cir. 2011). The first step in the analysis is to determine whether an actual conflict exists between the laws of the two states, which is done "by examining the substance of the potentially applicable laws to determine whether there is a distinction between them." *Carrow v. Fedex Ground Package Sys., Inc.*, 2017 WL 1217119, at *4 (D.N.J. Mar. 30, 2017) (quoting *P.V. ex re T.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008)). If no conflict exists, then the court applies the law of the forum state and ends the conflicts inquiry. *See Rowe v. Hoffman–La Roche, Inc.*, 189 N.J. 615, 621 (2007).

The matter before the Court is based on diversity jurisdiction, and thus, the Court will apply New Jersey's choice-of-law rules. Here, no apparent conflicts exist between New Jersey and New York law and the parties appear to agree that New Jersey law applies. *See Manley Toys, Ltd. v. Toys R Us, Inc.*, 2013 WL 244737, at *2 (D.N.J. Jan. 22, 2013) ("Because the parties have argued the viability of the remaining claims as though New Jersey substantive law applies, the Court will assume that to be the case.") (citing *USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999)). In addition, New Jersey appears to have the most significant relationship with the current matter. Moreover, the Transportation Agreement sets out that the rights of the parties will be governed by New Jersey law. "Generally, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy." *Nuzzi v. Aupaircare*, Inc., 341 F. App'x 850, 852 (3d Cir. 2009) (internal quotation marks omitted). Consequently, the Court applies New Jersey law.

## III. Defendants' Motion for Summary Judgment as to Summit's Claims

### A. Count 1: Breach of Contract – Joint Venture

Summit's breach of contract claim is based on its alleged joint venture with Defendants. Defendants respond that there was never a joint venture, just a business relationship with Summit. The parties primarily focus on whether a joint venture existed, but they also raise basic contract, implied contract, and parol evidence issues.

To state a claim for breach of contract under New Jersey law, a party must allege (1) the existence of a contract; (2) breach of the contract; (3) damages as a result of the breach; and (4) that the complaining party performed its own duties under the contract. *Pollack v. Quick Quality Restaurants, Inc.*, 452 N.J. Super. 174, 188 (App. Div. 2017) (citing *Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482 (2016)). In interpreting a contract, a court must determine the intention of the

parties as revealed by the language in the agreement. *Globe Motor*, 225 N.J. at 483 (citation omitted). To this end, the plain language of the contract is ordinarily the best indicator of the parties' intent. *Chubb Customs Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008) (citation omitted). In other words, unless an actual ambiguity in the contract exists, a court should not engage in a strained reading of the agreement to justify a different result than that which the parties bargained for. *Id.* (citation omitted). An ambiguity exists when a contract term is "susceptible to at least two reasonable alternative interpretations[.]" *Id.* (citing *Nester v. O'Donnell,* 301 *N.J. Super.* 198, 210 (App. Div. 1997)). If a contract's term is ambiguous, a court may consider extrinsic evidence to interpret the term. *Id.* (citation omitted). A court will also normally construe the ambiguous term against the drafting party if the parties had "unequal bargaining power." *Id.* (citing *Pacifico v. Pacifico,* 190 *N.J.* 258, 268 (2007)).

Turning to implied contracts, "a contract that is implied in fact has the same legal effect as an express contract." *Duffy v. Charles Schwab & Co.*, 123 F. Supp. 2d 802, 816 (D.N.J. 2000). "The only difference between an implied-in-fact contract and an express contract is that the parties' agreement has been manifested by conduct instead of words." *Id.* at 816-17. "The relevant inquiry when proof of agreement is sought to be established through conduct rather than words is whether the conduct of the defendant, as viewed by a reasonable person in the relevant custom or trade, revealed a promise to pay." *Id.* at 817.

The parol evidence rule bars consideration of "any previous oral representations or agreements" that purport to "vary, modify, or supersede the written contract." NJSA 12A:2-202; *Genesis Bio Pharmaceuticals, Inc. v. Chiron Corp.*, 27 Fed. Appx. 94, 99 (3d Cir. 2002) (applying New Jersey law) (internal citations omitted). The parol evidence rule applies to oral and written agreements made before the agreement is signed, not after. Parol evidence cannot be used to

contradict express terms of the contract itself. *Atl. N. Airlines v. Schwimmer*, 12 N.J. 293, 302 (1953).

As to joint ventures, "there is no 'hard and fast rule for determining whether a joint venture exists.'" *PCC Const.*, 90 F. Supp. 2d at 519. Under New Jersey law, a joint venture is very similar to a partnership[8] with the only difference being that joint venture relationships are "more informal and usually limited to a single undertaking or transaction, although the conduct of that enterprise may continue for a number of years." *Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co.*, 611 F. Supp. 665, 679 (D.N.J. 1985) (citing *Cooperstein v. Shapiro*, 122 N.J. Eq. 238 (E. & A. 1937)). A partnership is defined more generally as "an association of two or more persons to carry on as co-owners a business for profit." *Presten v. Sailer*, 225 N.J. Super. 178, 191–92 (App. Div. 1988) (quoting N.J.S.A. 42:1-6). As noted, a joint venture's objective as a business venture tends to be more limited. *Id.* (citing *Grober v. Kahn*, 47 N.J. 135, 147 (1966); *Clemens v. O'Brien*, 85 N.J. Super. 404, 414 (App. Div. 1964) (joint venture is for commercial or profit-making purposes); *Wittner v. Metger*, 72 N.J. Super. 438, 444 (App. Div. 1962)).

"The *sine qua non* of a joint venture is a contract, express or implied; that is, an actual agreement between the parties." *Hellenic Lines, Ltd.*, 611 F. Supp. at 679 (citing *Sullivan v.*

---

[8] Summit argues that Defendants improperly rely on the New Jersey Uniform Partnership Act (UPA), N.J.S. § 42:1A-1 *et seq.* Opp. at 26 n.4. Defendants respond that the UPA is applicable. Reply Br. at 12. There is legal support for Defendants' position. "The rules of law which apply to partners apply also to joint ventures." *See 68th St. Apts., Inc. v. Lauricella*, 142 N.J. Super. 546, 559, aff'd, 150 N.J. Super. 47 (App. Div. 1977). Defendants further assert that various UPA sections have been applied to joint ventures. Again, Defendants appear correct. *See Interlink Grp. Corp. USA v. Am. Trade & Fin. Corp.*, 645 F. App'x 125, 129 (3d Cir. 2016) (applying N.J.S.A. 42:1A-24 as to duties owed); *Paniagua Grp., Inc. v. Hosp. Specialists, LLC*, 183 F. Supp. 3d 591, 604 (D.N.J. 2016) (applying N.J.S.A. 42:1A-18(a) as to joint and several liability for obligations); *UBI Telecom Inc. v. KDDI Am., Inc.*, 2014 WL 2965705, at *11 (D.N.J. June 30, 2014) (applying N.J.S.A. 42:1A-10(c) as to sharing of profits). Finally, because joint ventures are akin to partnerships, the Court sees no reason why the UPA would not, at a minimum, be a persuasive authority to consider.

*Jefferson, Jefferson & Vaida*, 167 N.J. Super. 282 (App. Div. 1979). "This agreement need not assume a particular form, or be formally executed, but may be implied wholly or in part from the acts and conduct of the parties." *Id.* (citing *Kozlowski v. Kozlowski*, 164 N.J. Super. 162, 171 (Ch. Div. 1978), aff'd, 80 N.J. 378 (1979)). "The agreement, whether implied, explicit, or a combination of the two, will be interpreted and its validity tested under the normal rules of contract construction." *Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1020, 1027 (D.N.J. 1995). Additionally, along with the actual agreement, the following elements must be present:

> (A) A contribution by the parties of money, property, effort, knowledge, skill or other asset to a common undertaking;
> (B) A joint property interest in the subject matter of the venture;
> (C) A right of mutual control or management of the enterprise;
> (D) An agreement to share in the profits or losses of the venture.

*Id.* (citing *Wittner v. Metzger*, 72 N.J. Super. 438, 444 (App. Div. 1962)). While there must be mutual control in a joint venture, the requirement need not extend to every aspect of the venture. *Id.* "A joint venturer may entrust actual control of the operation to his co-venturer and it still remains a joint venture." *Wittner,* 72 N.J. Super at 446. "[J]oint venturers may agree that responsibility for particular tasks shall reside with less than all the venturers." *Id.* (citing *Wittner v. Metzger*, 72 N.J. Super. 438, 444 (App. Div. 1962)).

Of note, other courts have observed that some of the elements of joint venture law are not as clear as set forth above. For example, the Second Circuit in *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 512-13 (2d Cir. 2004), noted that the law in New Jersey on joint ventures has been applied inconsistently. The Second Circuit continued that some New Jersey courts have held that "sharing of profits *and* losses is required, while others hold that sharing of profits *or* losses is sufficient." *Id.* (citing *Wittner,* 72 N.J. Super. at 444 (sharing of profits and losses required); *Hellenic Lines, Ltd.*, 611 F. Supp. at 679 (sharing of profits or losses); *Ruta v. Werner*,

1 N.J. Super. 455 (Ct. Ch. Div. 1948) (finding a joint venture despite lack of allocation of losses); *Rodin Properties–Shore Mall, N.V. v. Cushman & Wakefield*, 49 F. Supp. 2d 728, 736–37 (D.N.J.1999) (ruling lack of shared losses does not preclude finding of joint venture); *First Mechs. Bank v. Comm'r of Internal Revenue*, 91 F.2d 275, 278 (3d Cir.1937) (same)).

Furthermore, according to *Geneva*, some New Jersey cases have indicated that not all elements are necessary, making them more akin to factors rather than elements. *UBI Telecom Inc. v. KDDI Am., Inc.*, 2014 WL 2965705, at *10-11 (D.N.J. June 30, 2014); *Burnham v. WMC Mortg. Corp.*, 2010 WL 2560657, at *7 (D.N.J. June 21, 2010) (citing *Wittner*, 72 N.J. Super. at 444). For example, in *Rodin*, 49 F. Supp. 2d at 736, the court found that a joint venture existed even though the parties may not have had equal management responsibilities or control of operations. *Id.* (citing 46 Am. Jur. 2d Joint Ventures § 16 (1994)). In *Upper Penns Neck Tp., Salem County v. Lower Penns Neck Tp., Salem County*, 20 N.J. Super. 280 (Ct. Law Div.1952), the court only considered some of the elements and found that joint ventures required an "agreement to enter into an undertaking in the objects or purpose of which the parties to the agreement have a community of interest and a common purpose in its performance."

Summit relies on *Geneva* in support of its position. In that case, the issue was whether one plaintiff, Apothecon, Inc., had standing to sue as a member of a joint venture with the other plaintiff, Geneva Pharmaceuticals Technology Corp. In concluding that a joint venture existed, the Second Circuit looked to the parties' contract. *Geneva*, 386 F.3d at 513-14. Initially, the court in *Geneva* found the contract to be more than a standard supply contract. Instead, the contract reflected an intent to share resources, including initial capital investments, toward a joint venture. *Id.* Next, the *Geneva* court continued, the contract provided a pooling of resources for sharing scientific and medical information as well as pre-clinical and clinical data. *Id.* The Second Circuit

then observed that each party had registration and filing responsibilities with the Food and Drug Administration (Geneva) and state Medicaid agencies (Apothecon), and both were involved in the development of drugs. *Id.* The *Geneva* court also pointed to overlapping control, including the plaintiffs' right to audit each other's relevant books and records and the right to inspect each other's facilities at any time. *Id.* Moreover, the Second Circuit added, there was a joint expectation to share in profits based on the percentage of sales. *Id.* Finally, the court in *Geneva* noted that the plaintiffs held themselves out as partners. *Id.*

The current matter is readily distinguishable from *Geneva*. Unlike the contract in *Geneva*, there is no textual support for a joint venture between Summit and Hess in the Transportation Agreement. There was no requirement of shared capital investments. There was no pooling of resources. There was no overlapping control. There was no proposed joint sharing of profits. Summit and Hess never held themselves out as partners. Summit had no right to audit Hess' books or to inspect Hess' facilities. In light of these significant differences, *Geneva* actually supports Defendants' position.

Similarly, Plaintiff's reliance on *U.S. ex rel. PCC Const., Inc. v. Star Ins. Co.*, 90 F. Supp. 2d 512 (D.N.J. 2000), is misplaced. First, in *PCC*, the issue was a violation of the federal Miller Act, and the court applied federal joint venture law. *Id.* at 518-19. In *PCC*, the contract between the general contractor and a subcontractor appeared to be a standard agreement, which militated against finding of joint venture. *Id.* at 518-20. Importantly, however, the following facts created a genuine issue of material fact precluding summary judgment as to whether a joint venture existed. *Id.* at 519-21. The subcontractor received 100% of the payments made to contractor. *Id.* at 519. The subcontractor acted as the contract administrator in the general contractor's agreement with the government. *Id.* The subcontractor's employees were placed on the contractor's payroll,

which the *PCC* court found to be a "key factor." *Id.* The contractor's project manager sought compensation from the subcontractor. *Id.* Finally, there was evidence that the contractor and subcontractor agreed to share losses. *Id.*

Here, by comparison, 100% of Hess' payments did not go to Summit; Summit employees were not on Hess' payroll; and Hess' employees did not seek compensation from Summit. The parties also did not agree to share losses of the overall business; instead, Summit was responsible for the losses that it caused. Marc Rosen mentioned two occasions where Hess financially contributed to losses caused by Summit. The first occasion involved a customer discount based on Summit's failure to obtain signed delivery receipts. D.E. 98-5 at 119-24. The second occasion transpired when Summit pumped the wrong type of fuel oil into the customer's boiler, causing a fire. *Id.* at 124-29. Hess asserts that these incidents were not examples of a joint venture, but instead a normal business response to Summit's "defalcations." Def. Br. at 20-21. "Hess took the commercially practical course of action – it settled the claims with its customer and required Summit to contribute." *Id.* at 21. Two occasions over 30 years is insufficient to be considered a course of conduct between the parties.

The Court finds that there is no genuine dispute of material fact precluding summary judgment as to the existence of a joint venture. As a result, the Court grants Defendants summary judgment as to Count One. Critically, Summit's principal, Marc Rosen undercuts important allegations in the Complaint. For example, despite the Complaint's allegations to the contrary, Marc acknowledged that Summit and Hess never split profits. Similarly, the Complaint alleges a joint venture between Hess and Summit as of 1985. Of course, this allegation is demonstrably wrong because Summit was not in existence until 1989. Summit's attempt to create a genuine issue of material fact where none exists is exemplified by Summit's representation that Hess'

representatives acknowledged, during discovery, the existence of a joint venture. This is a complete mischaracterization of the testimony. Hess' representatives merely acknowledged that the parties had a business relationship – a fact that has never been in dispute.

Moreover, the Transportation Agreement does not support a joint venture. The Court has already discussed many of the reasons why in distinguishing the cases, *Geneva* and *PCC*, relied on by Summit.[9] Among other things, the Transportation Agreement makes no reference to a joint venture. To the contrary, it expressly refers to Summit as an independent contractor. The Transportation Agreement also makes no reference to sharing profits or losses. Summit's claim that Hess promised some form of payment or remuneration to Summit if Hess sold its business is also completely undercut by the plain language of the Transportation Agreement. No such promise is referenced in the Transportation Agreement; in fact, the agreement gives Hess the right to terminate during any renewal period merely by providing 30-days written notice. The Transportation Agreement also contains an integration clause which indicates that any prior "agreements, understandings, warranties or representations, oral or written, expressed or implied" of the parties are superseded by the Transportation Agreement. Thus, to the extent Summit is relying on some alleged activity or representation prior the Transportation Agreement, such evidence would be barred by the parol evidence rule and by the integration clause in the contract.

In short, there are no genuine disputes of material facts as to any of the elements (or factors)

---

[9] Plaintiff attempts to ameliorate the effect of the Transportation Agreement by claiming it was simply a "boilerplate document." Opp. at 24. According to Plaintiff, the Transportation Agreement does not "obliterate the facts of record that demonstrate the actual relationship and the actual conduct, of the parties which – again the evidence showed – continued exactly as they had been after that boilerplate document was signed." *Id.* The Court disagrees. The Transportation Agreement was entered into by sophisticated parties, Summit and Hess, and clearly sets forth the parties' relationship. If Summit did not agree with its contents, Summit should not have entered into the Transportation Agreement.

of a joint venture that precludes summary judgment in favor of Defendants. There was no mutual control or management of the enterprise. There was no agreement to share in profits or losses. There was no joint property interest in the subject matter of the venture. Hess supplied fuel oil, and Summit delivered it to customers. As the Transportation Agreement reflects, Summit was an independent contractor and carrier.

Summit alternately argues that if the Court does not find an express agreement as to a joint venture, it had an implied joint venture agreement with Summit. Opp. at 32. Plaintiff claims that it does not matter whether their joint venture agreement was in an express or implied contract, because based on their 25-year conduct, the agreement existed. *Id.* at 33. Plaintiff argues that Defendants allegedly breached this agreement when it sold its fuel oil business, depriving Summit of the continued exclusive transportation rights to its own accounts. *Id.* While a joint venture can be established through an implied contract, the evidence here does not support such a finding. An implied contract based on the parties' conduct, as opposed to any express agreement (be it verbal or in writing), is very difficult to establish as to *future* promises. Summit is claiming that through the parties' conduct, Hess effectively promised that if Hess sold its fuel oil business at some indefinite point in the future, Summit would have some rights as to the customers Summit originally located. Summit, however, has not pointed to any evidence that creates a genuine issue of material fact in this regard.

In conclusion, there is no genuine issue of material fact and the Court finds that Defendants are entitled to summary judgment on Plaintiff's breach of contract claim.

### B. Counts 2 and 5: Breach of the Covenant of Good Faith and Fair Dealing and Unjust Enrichment

The implied covenant of good faith and fair dealing is a "component of every contract" that requires both parties to a contract act in "good faith[,]" that is, they must "adher[e] to

25

'community standards of decency, fairness, or reasonableness.'" *Iliadis v. Wal-Mart Stores, Inc.*, 181 N.J. 88, 109 (2007) (internal citations omitted). Good faith "requires a party to refrain from 'destroying or injuring the right of the other party to receive its contractual benefits.'" *Id.* at 110 (citation omitted). To succeed on a claim for breach of the covenant of good faith and fair dealing, a party must prove that "(1) the [opposing party acted] in bad faith or with a malicious motive, (2) to deny the [party] some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract." *Yapak, LLC v. Mass. Bay Ins. Co.*, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009). Pursuant to New Jersey law, "a plaintiff cannot maintain a claim for breach of the implied covenant of good faith and fair dealing when the conduct at issue is governed by the terms of an express contract or the cause of action arises out of the same conduct underlying the alleged breach of contract." *Kare Distribution, Inc. v. Jam Labels & Cards LLC*, 2012 WL 266386, at *7 (D.N.J. Jan. 30, 2012) (internal quotation marks omitted). Here, Summit and Hess' conduct is governed by the Transportation Agreement. As a result, Defendants are entitled to summary judgment on Count 2 because the alleged joint venture would contradict the express terms of the Transportation Agreement.

To state a claim for unjust enrichment, a party must allege "'(1) that the [opposing party] has received a benefit from the [party], and (2) that the retention of the benefit by the [opposing party] is inequitable.'" *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 519 (D.N.J. 2009), *aff'd*, 374 Fed. Appx. 341 (3d Cir. 2010). "Quasi-contract liability will not be imposed when a valid, unrescinded contract governs the rights of the parties." *Duffy v. Charles Schwab & Co.*, 123 F. Supp. 2d 802, 814 (D.N.J. 2000). "Since a plaintiff must confer a benefit on the defendant to support an unjust enrichment claim, this element has been interpreted by New Jersey courts as a requirement that 'the plaintiff allege a sufficiently direct relationship with the defendant to support

the claim.'" *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 724 (D.N.J. 2011) (quoting *Nelson v. Xacta 3000 Inc.*, 2009 WL 4119176, at *3 (D.N.J. Nov. 24, 2009)). Furthermore, New Jersey's doctrine of unjust enrichment serves to protect a party's interest where an adequate remedy does not exist at law and equity demands restitution. *Cooper v. Samsung Elecs. Am., Inc.*, 2008 WL 4513924, at *9 (D.N.J. Sept. 30, 2008), *aff'd*, 374 F. App'x 250 (3d Cir. 2010). Count 5 also fails because the Transportation Agreement governs and because Summit is again attempting to gain a benefit that is at odds with the terms of the Transportation Agreement.

For the foregoing reasons, there is no genuine issue of material fact and the Court finds that Defendants are entitled to summary judgment on Plaintiff's breach of the covenant of good faith and fair dealing claim and its unjust enrichment claim.

### Count 3: Breach of Duty to Co-Venturer

Summit argues that Defendants are liable for the alleged joint venture obligations and liabilities of Hess, since Direct Energy Business, LLC ("Direct Energy"), HEM's parent company, bought Hess' New York City energy marketing business, acquiring its assets and assuming its liabilities. Opp. at 33. This count fails for two reasons. First, as indicated above, the Court finds that there is no genuine dispute of material fact to support Summit's claim that a joint venture ever existed between Summit and Hess. Second, even if a joint venture had existed, HEM would still not be subject to successor liability under New Jersey law.

Traditionally, under New Jersey law, "'where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor.'" *Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 340 (1981) (quoting *Menacho v. Adamson United Co.*,

420 F. Supp. 128, 131 (D.N.J. 1976)).[10] However, a purchaser could be held responsible for the seller's debts and liabilities in four scenarios:

> (1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities.

*Ramirez*, 86 N.J.at 340-41. In *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 766 (D.N.J. 2013) (emphasis in the original), the court observed that it could not find any New Jersey Supreme Court authority where "the sale or transfer of *some* of a company's assets could amount to successor liability." The *Jurista* court reasoned that a successor corporation's requirement of obtaining all assets for successor liability purposes is justified because "if several corporations purchase some of a selling corporations [sic] assets, it becomes a legal thicket to ascertain which purchaser was successively liable for what degree of the sellers debts and liabilities." *Id.* at 766–67. Here, Hess only sold some of its assets and otherwise remains in business. Thus, HEM is not subject to successor liability.

For the foregoing reasons, there is no genuine issue of material fact and the Court finds that Defendants are entitled to summary judgment on Plaintiff's breach of duty to co-venturer claim.

---

[10] It appears that New Jersey takes a slightly different approach as to successor liability and products liability. *See Ramirez*, 86 N.J. at 343. In such instances, New Jersey courts have recognized that where "*substantially all* the manufacturing assets of another corporation" are purchased and where the successor corporation "undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line.'" *Jurista* 492 B.R. at 767 n.39 (emphasis in the original) (quoting *Potwora ex rel. Gray v. Grip*, 319 N.J. Super. 386, 390 (App. Div. 1999). Nevertheless, "[t]he 'substantially all' language has not been utilized by New Jersey courts with respect to non-product liability asset transfer successor liability claims." *Id.*

## A. Count 4: Estoppel

Plaintiff claims that it relied, to its detriment, on Defendants' conduct "by entrusting them with Summit's confidential and proprietary client information, client relationships, ceasing its own independent retailing activities in the territory of the Hess Energy Marketing joint venture and thereby surrendering tis own goodwill and economic opportunities." Compl. ¶ 67. Therefore, Summit continues, Defendants are estopped from denying that a joint venture existed. *Id.* at ¶ 68. In its Opposition, Plaintiff does not specify whether it is claiming promissory or equitable estoppel. The Court examines both.

Promissory estoppel and equitable estoppel have similar purposes. The main justification for promissory estoppel "is to avoid the substantial hardship or injustice which would result if such a promise were not enforced." *Newark Cab Ass'n v. City of Newark*, 235 F. Supp. 3d 638, 648 (D.N.J. 2017), aff'd, 901 F.3d 146 (3d Cir. 2018) (quoting *Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc.*, 307 N.J. Super. 461, 469 (App. Div. 1998)). Similarly, equitable estoppel "is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment." *Knorr v. Smeal*, 178 N.J. 169, 178 (2003) (citing *Mattia v. Northern Ins. Co. of New York*, 35 N.J. Super. 503, 510 (App. Div. 1955)).

Under New Jersey law, the elements of promissory estoppel are: "1) a clear and definite promise, 2) made with the expectation that the promisee will rely upon it, 3) reasonable reliance upon the promise, 4) which results in definite and substantial detriment." *E. Orange Bd. of Educ. v. N.J. Sch. Const. Corp.*, 405 N.J. Super. 132, 148 (App. Div. 2009) (internal quotation marks omitted). In order to establish equitable estoppel, "plaintiffs must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment." *Knorr*, 178 N.J. at 178 (citing *Miller v. Miller*, 97

N.J. 154, 163 (1984)).

Plaintiff's claim for estoppel relies solely on the alleged joint venture, and the Court has already granted Defendants' summary judgment on this issue. Therefore, the Court similarly finds that Defendants are entitled to summary judgment on Plaintiff's estoppel claim.

### IV.     Hess' Motion for Summary Judgment as to the Counterclaims

Hess filed a Counterclaim against Summit seeking $980,233.96 for Hess' fuel oil that Summit allegedly received but did not pay for. Hess also named Horizon, Marc Rosen, Kenneth Rosen, and Laura Rosen as Counterclaim-Defendants. In support of its motion, Hess argues that breach of contract, quantum meruit, account stated, and the guaranties that it entered into with Marc, Kenneth, and Laura Rosen.

Hess first claims that Summit and Horizon are liable to Hess under a breach of contract claim. As noted, Summit allegedly owed the money, but Hess sent the invoice to Horizon. Under the Transportation Agreement, Hess stated that it would bill Summit; the contract does not mention Horizon, much less billing Horizon in lieu of Summit. The Transportation Agreement also indicated that all modifications to the contract had to be in writing and signed by the parties. Hess has not produced any written modification. Therefore, there is a genuine issue of material fact as to proper invoicing for the reconciliation, and the Court finds that Hess is not entitled to summary judgment as to its breach of contract counterclaim.

Hess also claims that Summit and Horizon are liable to Hess under the theory of quantum meruit. Def. Br. at 36. To succeed on a claim of quantum meruit, the following four elements must be met: "(1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefore; and (4) the reasonable value of the services." *TBI Unlimited, LLC v. Clearcut Law Decisions, LLC*, 2013 WL

1223643, at *5 (D.N.J. Mar. 25, 2013) (citing *Starkey v. Estate of Nicolaysen*, 172 N.J. 60, 68 (2002)).

As noted, the invoice was sent to Horizon, who was not a party to the Transportation Agreement. Summit claims to have never received the invoice, and therefore, could not properly contest the invoice under the reconciliation process.[11] Therefore, there is a genuine issue of material fact, and the Court finds that Defendant is not entitled to summary judgment as to its quantum meruit counterclaim.

Hess further argues that it is entitled to summary judgment under the concept of account stated. "Account stated is a theory to recover the value of goods delivered or services rendered when there is an "exact and definite balance ... struck as to which both the creditor and the debtor assent." Manley Toys, Ltd. v. Toys R Us, Inc., 2013 WL 244737, at *5 (D.N.J. Jan. 22, 2013) (quoting 29 Williston on Contracts § 73:56). The Restatement (Second) of Contracts, § 282 provides as follows:

> (1) An account stated is a manifestation of assent by debtor and creditor to a stated sum as an accurate computation of an amount due to a creditor. A party's retention without objection for an unreasonably long time of a statement of account rendered by the other party is a manifestation of assent. (2) The account stated does not itself discharge any duty but is an admission by each party of the facts asserted and a promise by the debtor to pay according to its terms.

*Id.* Yet, "[a]n account stated may always be impeached for mistake. It is *only [p]rima facie evidence* of its correctness." *Clarke v. Camden Tr. Co.*, 84 N.J. Super. 304, 310 (Law. Div. 1964) (emphasis added), *aff'd*, 89 N.J. Super. 459 (App. Div. 1965). "The statement of an account is *not*

---

[11] The record is not clear whether Summit is actually contesting that it received $980,233.96 in fuel oil from Hess for which it did not pay. If there is no actual dispute as to the amount owed, then it appears that Hess would be entitled to judgment, but that is not how the issue was presented to the Court in the current motion.

*conclusive, but only presumptive evidence* against the party admitting the balance to be against him." *Vanderveer v. Statesir*, 39 N.J.L. 593, 596 (Sup. Ct. 1877) (emphasis added). "An account stated or settled is a mere admission that the account is correct. It is not an estoppel. . . . Its effect is to establish, prima facie, the accuracy of the items, without other proof." *Wilbur v. Win, 89 N.J. Eq. 278, 283 (Ch. 1918)* (internal quotation marks omitted). "[I]t is clear that the account stated doctrine operates generally as a rule of evidence, is primarily applicable to disputes between debtors and creditors over amounts owed, and may become binding only as the result of detrimental reliance." *Pan Am. World Airlines, Inc. v. Midatlantic Nat. Bank/N.*, 1989 WL 78229, at *5 (D.N.J. July 12, 1989). Because the doctrine of account stated provides *only prima facie* evidence of correctness rather than conclusive proof, it is not a basis on which Hess can be granted summary judgment.

Hess also seeks to recover the $980,233.96 pursuant to the guaranties that it had with the Rosens. "Like any other contract, a guaranty must be supported by consideration to be enforceable." *Scarlet Kim & Co. v. Clocell, Inc.*, 2017 WL 2727087, at *2 (D.N.J. June 22, 2017).

> A mere promise to pay an antecedent debt of another is not generally regarded as consideration for a guaranty. However, either a slight benefit to the promisor or a trifling inconvenience to the promisee suffices. Importantly, it is unnecessary that any consideration pass directly from the guarantee to the guarantor, and any consideration moving from the original obligors to the guarantor is sufficient to support the guaranty contract.

*Id.* (quoting *Great Falls Bank v. Pardo*, 263 N.J. Super. 388, 401 (Ch. Div. 1993) *aff'd*, 273 N.J. Super. 542 (App. Div. 1994) (internal citations omitted)). "A guaranty can be supported by the same consideration that supported the original contract on which it is based only if the guaranty and the original contract were executed simultaneously." *Id.* (citing *Sapta Glob., Inc. v. Cilicorp, LLC*, 2015 WL 1469600, at *6 n.5 (D.N.J. Mar. 30, 2015)).

As mentioned above, Kenneth and Laura Rosen executed an unconditional guaranty on behalf of Horizon, while Marc Rosen executed a separate unconditional guaranty on behalf of Summit. D.E. 98-11. Therefore, Kenneth and Laura Rosen's guaranty only extended to Horizon's debts with Hess. Hess has not pointed to any language in the guaranty demonstrating that it applies to Summit's debts to Hess. As a result, summary judgment is denied as to Kenneth and Laura Rosen. As to Marc Rosen, Hess' argument fails for the same reasons that its breach of contract and quantum meruit arguments do. There is a genuine issue of material fact, according to the record presented, as to whether Summit ever received proper notice of the owed amounts under the terms of the Transportation Agreement.

## V.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment as to Plaintiff's claims is **GRANTED**, and Hess' motion for summary judgment as to its counterclaims is **DENIED**. An appropriate Order accompanies this Opinion.


Dated: February 1, 2019


John Michael Vazquez, U.S.D.J.